# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-509V**
**Filed: July 10, 2026**

| | |
|---|---|
| ALICIA GOODNIGHT,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for petitioner.*
*Nina Ren, U.S. Department of Justice, Washington, DC, for respondent.*

**DECISION**[1]

On January 11, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a Table Injury of a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccination she received on November 14, 2020. (ECF Nos. 1, 37.) For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(c). To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence". § 300aa-13(a)(1). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

After initially filing her petition, petitioner filed medical records (Exhibits 1-13, 15-20) over the course of about a year and a half. Based on the allegations of the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit or "SPU." (ECF Nos. 33-34.) However, the case was reassigned to the undersigned in June of 2023 after respondent filed a Rule 4 Report, recommending against compensation. (ECF Nos. 40-42.)

After the case was reassigned, I issued an Order to Show Cause why the case should not be dismissed. (ECF No. 43.) Noting that petitioner pleaded SIRVA while her medical records instead documented a cervical radiculopathy diagnosis, I directed petitioner to present a medical opinion sufficient to demonstrate that her symptoms are not attributable to her diagnosed cervical radiculopathy. (*Id*. at 2.)

Petitioner then filed additional orthopedic medical records (Exhibit 21), a report by Marko Bodor, M.D. (Exhibits 22-33), and a written response to the show cause order (ECF No. 53). (ECF Nos. 48-53.) Dr. Bodor suggested that the findings supportive of cervical radiculopathy were not "definitive" and opined that her presentation was more consistent with a shoulder injury. (Ex. 22, pp. 3-4.) Based on a review of petitioner's filings, I concluded that petitioner had demonstrated that dismissal at that juncture was not appropriate, though I deferred any analysis of the ultimate weight of Dr. Bodor's opinion. (Non-PDF Scheduling Order, filed Jan. 23, 2024.)

Respondent then filed a responsive report by Brian Callaghan, M.D. (ECF No. 56; Exs. A-B.) Dr. Callaghan supported the diagnosis of cervical radiculopathy reached by the treating physicians. (Ex. A, p. 6.) Petitioner was permitted an opportunity to have Dr. Bodor respond to Dr. Callaghan's report; however, she instead filed a report by Naveed Natanzi, D.O. (ECF No. 60; Exs. 35-39.) She also filed an affidavit. (ECF No. 61; Ex. 40.)

Thereafter, petitioner filed a motion for a ruling on the written record. (ECF No. 68.) Respondent filed a response (ECF No. 69), but petitioner did not file any reply. In her motion petitioner primarily focuses on her contention that she suffered a Table Injury of SIRVA, but she also includes an alternative argument that she has demonstrated a shoulder injury caused-in-fact by her vaccination. Respondent disputes that petitioner has preponderantly demonstrated entitlement to compensation under either approach.

I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

## III. Factual Summary[3]

Petitioner received the vaccination at issue in this case on November 14, 2020, in connection with a physical for a nursing program. (Ex. 1; Ex. 2, p. 32; Ex. 40, p. 1.) It was administered in her right deltoid. (Ex. 1.) At that time, petitioner denied having any "muscle or joint problems," "arthritis," or "wrist, hand, or arm trouble including carpal tunnel." (Ex. 2, p. 32.) No issues were noted during her physical exam. (*Id*. at 33.)

In her written statement, prepared about four years later in December of 2024, petitioner recalled that while the vaccine was being administered "I felt an enormous amount of pain" and "I continued to have pain in my arm for a couple of hours and the pain was becoming unbearable." (Ex. 40, p. 1.) She recalled that she drove herself to the emergency department because she thought she was having a heart attack and, when she arrived at the hospital, "I told them that my right arm would not move and that I was having pain in the right side of my chest and down my right shoulder." (*Id.* at 2.)

However, the contemporaneous medical record documented a different onset and included no mention of any inability to move the arm. It states:

**Presentation**
**Chief Complaint** Chest pain

**Context**
**Additional Context**
PT PRESENTS TO THE ED FOR EVALUATION OF NONTRAUMATIC CHEST PAIN THAT BEGAN SUDDENLY WHILE AT REST APPROXIMATELY 5 MINUTES PRIOR TO ED ARRIVAL. THE PAIN HAS REMAINED CONSTANT SINCE ONSET, IS PRESENT AT REST, LOCATED IN THE RIGHT CHEST REGION, RADIATES INTO THE RUE, IS SEVERE, SHARP, AND IS WITHOUT OTHER ASSOCIATED ACUTE SYMPTOMS.

(Ex. 6, p. 411.) Upon musculoskeletal exam, petitioner was noted to be able to move all extremities. (*Id.* at 424; *see also id.* at 422 (stating "Musculoskeletal [within defined parameters]: Yes"); *id.* at 413-14 (documenting no specific upper extremity findings).) Petitioner was transferred for admission to another hospital where her cardiologist had privileges. (*Id*. at 417.)

Upon admission to this second facility, petitioner reported "sudden onset of none [sic] exertional chest pain sharp level 10/10 radiation to right upper arm and towards her upper back and neck accompanied with elevated blood pressure of 189/103 and right hand numbness and weakness[,] weakness lasting 10-15 minutes." (Ex. 4, p. 44.) Physical exam documented "Extremity: No clubbing or cyanosis. No edema" and "Muscular: Moves all extremities." (*Id*. at 45.) However, due to the complaint of right arm weakness and pain radiating from the neck into the shoulder, petitioner underwent

[3] This factual summary focuses on petitioner's medical history as it pertains to her alleged shoulder injury. Throughout the medical encounters discussed, including encounters assessing petitioner's right arm and shoulder complaints, petitioner did include other complaints that are not relevant to the analysis that follows.

a cervical spinal CT. It showed a potential straightening of the cervical lordosis possibly due to muscle spasm, but no areas of spinal stenosis. (*Id*. at 50.) She was discharged on November 15, 2020, and her discharge diagnoses included "atypical chest pain," "right arm pain and numbness," and "neck pain." (*Id*. at 48.)

Five days later, on November 20, 2020, petitioner presented to a physician's assistant at her primary care provider. (Ex. 4, p. 21.) The chief complaint was "Flu shot reaction, ER and hospital admittance." (*Id.*) She reported that, after receiving her vaccination (specifically, "the day after"), she went to the emergency department for "chest pain, numbness, and tingling down her right arm." (*Id*.) After noting a negative cardiac work up, "[n]ow she states her whole right upper arm is numb to her fingertips." (*Id*.) Review of systems noted only right arm paresthesia under musculoskeletal, and physical exam noted no abnormalities following examination of petitioner's right fingers, hand, wrist, elbow, and shoulder. (*Id*. at 22-23.) Petitioner's neurologic exam found normal strength in the upper right extremity and no abnormalities were detected upon sensory exam. (*Id*. at 23.) Although petitioner requested an MRI of her right arm, the physician's assistant did not believe that was warranted. (*Id*. at 21, 23.) Instead, she documented that she "[d]iscussed at length with patient that I did not believe vaccine caused symptoms and she should apply warm compress at site of vaccine and take Motrin or Tylenol if she experienced pain."[4] (*Id*. at 23.)

Four days later, on November 24, 2020, petitioner returned to her primary care office, this time seeing her physician. (Ex. 4, p. 16.) Her chief complaint was "complaint of right arm" with active problems including "arthralgia – shoulder region right," "disturbances of skin sensation," and "limb pain right arm." (*Id*.) This history indicated that "[p]atient has complaint of right arm pain since having her flu shot. Has tingling sensation in her right hand. . . . Denies having trauma or injury." (*Id*.) Review of systems indicated under musculoskeletal that petitioner had "right arm pain and tingling in the right hand. No arthralgias and no localized joint pain." (*Id*.) On physical exam, palpation of the neck revealed no abnormalities. (*Id*. at 17.) Under "skin," it was documented that there was "no signs of infection, bruising, etc . . . of the R arm. [S]ome pain on pressure of mid R upper arm." (*Id*.) Otherwise, no upper extremity exam was documented. (*Id*.) Right shoulder x-rays were ordered, which were unremarkable, and petitioner was referred to an orthopedist. (*Id*. at 18, 37.)

Petitioner then presented to an orthopedist on January 19, 2021, for treatment of her right shoulder. (Ex. 3, p. 8.) She provided the following history:

[4] Notably, however, the physical exam had confirmed no skin lesion, erythema, or swelling of the right deltoid at the site of injection. (Ex. 4, p. 23.)

40-year-old female comes in today for evaluation of her right shoulder. Patient states that she recently received an influenza injection into her right shoulder. Patient noted that after her injection she had numbness tingling and decreased motor skills of her right arm. Patient was worked up for a stroke by her primary care which was negative. Patient was then referred here for further orthopedic evaluation due to her shoulder pain. Patient states the pain starts over her shoulder and also extends along the border of her scapula. Patient states that the numbness tingling and motor deficits have dissipated with time however her pain still remains. Patient states she has full range of motion of her arm but is difficult to sleep at night and wakes her up.

(*Id*.)

Upon physical examination, petitioner had full range of motion throughout all planes of her right shoulder. (Ex. 3, p. 9.) She had minor tenderness to palpation over the lateral aspect of her right arm and shoulder and was also positive to palpation along the border of the right scapula. (*Id*.) She was assessed with "acute pain of the right shoulder" and "scapular dyskinesis." (*Id*.) The orthopedist noted that "[a]t this time patient has no mechanism [of] injury which would suggest a soft tissue injury of her right shoulder." (*Id*.) He recommended conservative treatment including NSAIDS, muscle relaxants, and physical therapy. (*Id*.) However, he further noted that it is "[l]ikely patient's neurological symptoms were due to injection of her right shoulder with possible radial nerve involvement." (*Id*.)

When petitioner presented to physical therapy on January 29, 2021, she indicated that her vaccination had been administered "too low, near the mid or lower 1/3 of lateral upper arm." (Ex. 9, p. 2.) She "noted swelling and pain immediately and eventually lost complete function in the entire R arm and has had numbness in the R hand/fingers at times." (*Id*.) It was further described that petitioner "ended up losing complete function of her RUE for a day or two." (*Id*. at 3.) She also described "numbness at times in the R palm and digits 2-5." (*Id*.) The physical therapist documented reduced active and passive range of motion with flexion, abduction, and external rotation, as well as reduced strength (4-/5) with flexion, extension, abduction, and internal and external rotation. (*Id*. at 2-3.) Petitioner was recommended physical therapy three times a week for six weeks. (*Id*. at 4.) She then presented for physical therapy sessions from February and through May. (*Id*. at 5-13, 16-36.)

On March 3, 2021, she returned to the orthopedist. (Ex. 15, pp. 11-12.) Petitioner reported that, despite being compliant with the treatment plan, "her symptoms are still present and physical therapy has not provided her any relief." (*Id*. at 11.) She "still complains of shoulder and neck pain with radicular type symptoms that extend to her right hand." (*Id*.) Upon examination, petitioner was noted to have painful, but full, range of motion in all planes of her right shoulder, tenderness to palpation, and numbness and tingling through dermatome C5-C6 and C7. (*Id*. at 12.) She was assessed as suffering acute pain of the right shoulder, neck pain, and radicular pain of the right upper extremity. (*Id*.) The orthopedist ordered MR imaging of the shoulder and cervical spine, as well as a nerve conduction velocity/electromyography ("NCV/EMG") testing. (*Id*.)

Petitioner's cervical spine and right shoulder MRIs were performed on March 19, 2021. (Ex. 15, pp. 14-15, 22-23.) The cervical MRI showed straightening of the cervical lordosis likely due to muscle spasm, degenerative anterior and posterior osteophytes at

multiple levels, early disc dehydration at almost all cervical levels, and mild posterior disc bulging at both C5-C6 and C6-C7. The disc bulging was “partially indenting the anterior thecal sac,” but there was no foraminal or central canal stenosis. (*Id*. at 14.) The right shoulder MRI showed a minimal acromioclavicular joint space effusion and a grade 1 tendinosis of the supraspinatus at the humeral insertion. (*Id.* at 23.) On April 12, 2021, petitioner underwent EMG/NCV testing. (*Id.* at 15.) It showed “[a]bnormal Nerve Conduction Velocity testing of the right upper extremity consistent with mild Carpal Tunnel Syndrome. EMG needle examination is abnormal in the right upper extremity consistent with chronic C4-C5, C5-C6 cervical radiculopathy.” (*Id*.)

Petitioner then returned to the orthopedist on April 14, 2021. (Ex. 15, pp. 6-7.) The orthopedist’s diagnoses remained unchanged, but upon review of petitioner’s MRIs and NCV/EMG, he explained “[a]t this time the patient’s history and physical exam correlate with neurological complaints consistent most likely from her cervical spine.” (*Id*. at 7.) He referred petitioner to neurosurgery and pain management and recommended physical therapy for the cervical spine. (*Id*.) She presented for a neurologist evaluation on May 6, 2021. (Ex. 20, pp. 1-2.) At that time, she provided the following history:

> <u>Patient History:</u>
> 40 YO female presenting as new patient after referral from Dr. Deiser for neck pain. Patient states that she has had neck pain and right upper extremity symptoms since November when she received the flu shot. She states that the flu shot was not administered in the correct area and then 2 hours later her arm was paralyzed and she had the hospital. She states that she contacted the place okay for the flu shot and "MA was new and apparently injected into a nerve or or blood vessel." Initially they thought that she had a stroke because of her right upper extremity paralysis that the workup was negative. Since then she has been going to physical therapy for her right upper extremity weakness. She states that she is able to move that this still has some decreased range of motion at the shoulder area. Patient admits to neck pain that is worse on the right side and around to the right shoulder. She admits to neck stiffness that is worse at night. She admits to right upper extremity weakness, dropping objects, numbness and paresthesias in her right hand and fingers. Patient denies bowel or bladder incontinence, difficulty ambulating. She has previously tried conservative management with ibuprofen, Tylenol and a anti-inflammatory that helped.

(*Id*. at 1.) Upon examination, petitioner had normal range of motion, but slightly decreased grip strength in the right upper extremity. Sensory exam was intact. (*Id.*) Hoffman’s and Trommer’s signs were negative. (*Id*.) The neurologist assessed petitioner with neck pain, muscle spasms of the neck, and radiculopathy affecting the upper extremity.[5] (*Id*. at 1-2.) However, based on review of the MRI, she did not believe surgical intervention was warranted because there was no stenosis or compression of any nerve root. (*Id*. at 2.) Therefore, continued physical therapy and conservative management was recommended. (*Id*.)

---

[5] Within the copy of the medical record filed as Exhibit 20 at ECF No. 31-2, the third listed diagnosis of radiculopathy affecting the upper extremity is obscured by petitioner’s bates stamping of the exhibit. However, petitioner’s motion for a ruling on the written record quotes the medical record as indicating that the third encounter diagnosis was “radiculopathy affecting upper extremity.” (ECF No. 68, p. 10 (quoting Ex. 20, pp. 1-2).)

Thereafter, petitioner presented to a pain management specialist. (Ex. 19, pp. 13-14.) She provided the following history:

Patient presents today for NP Apt. Pt staets she has neck/back/right arm pain. She states It started after a flu vaccine on Nov 14, 2020. She states she is in nursing school and she had to get vaccines and recelved the vaccine wrong. She had to go to the hospital because the belleved she had a stroke due to no feelIng in her arm. She was In PT 3x weekly, and is due to have It renewed. She rates her paln 8/10. She states the pain Is aggravated by lying down. Her neuro surgeon called In a muscle relaxer and sterold, but she hasn't picked them up yet. She Is seeing Neurologlcal Speclalist of South Florida in Ft Plerce. She was told that she wIll most Ilkely be dealing with thls the rest of her life. She states rIght now there is nothIng really that helps. She does have an MMJ card that helps her sleep a lIttle. She has an MRI of her C-spIne that we have the results of. She Is doIng PT at Advanced MotIon. She c/o contant numbness In rIght hand sInce a blooddraw the same day of the flu vaccIne, states that she had nerve damage from a hematoma. She has also gaIned weight since the InJury.

(*Id*. at 13.) On exam, petitioner was noted to have "right shoulder flexion and abduction to 90 degrees[,] limited right lateral rotation of neck[, and] tender right upper trapezii and right deltoid." (*Id*.) Her listed diagnoses were cervicalgia, "other cervical disc displacement, unspecified cervical region," "other chronic pain," "anesthesia of skin," and "pain in unspecified shoulder." (*Id*. at 14.) She returned for a follow up on June 17, 2021, and it was noted that she would restart physical therapy and treat with Neurontin, Celebrex, and Percocet. (*Id*. at 9-11.)

During a primary care encounter of November 3, 2021, petitioner later reported "ongoing right upper extremity numbness, decrease[d] ROM and RUE weakness [] which she believes to be a nerve injury from a flu vaccination." (Ex. 12, p. 80.) On exam, it was noted that her right shoulder was limited to about 100 degrees of abduction due to pain. It was also noted that she had bilateral cervical paraspinal muscle spasm. (*Id*. at 82.) She was referred back to neurology. (*Id*. at 83.) However, there is no indication she pursued that referral. Instead, she presented for an orthopedic evaluation about two years later on September 26, 2023. (Ex. 21, pp. 4-5.) By that time, this case had been pending for multiple years, respondent had already filed his Rule 4(c) Report recommending against compensation, and I had already issued an order to show cause why petitioner's condition was not explained by cervical radiculopathy. (ECF Nos. 40, 43.) In contrast to prior encounters, petitioner provided the following history:

**HPI:** This is a 42 year old female who is being seen for a chief complaint of Right shoulder pain. Pt present today for initial evaluation

The symptoms Were not due to an accident. However patient is states having pain after the Flu injection in 2020. The symptoms are localized to the right shoulder especially in the posterior aspect described as 8/10 with associated limited range of motion weakness which started around 3 years.

Prior treatment: Gabapentin and physical therapy.

(Ex. 21, p. 4.) On physical exam, petitioner was negative for tenderness to palpation and had "functionally normal" range of motion; however, she did have slightly reduced strength of the supraspinatus. (*Id*.) She had positive Neer and Hawkins tests. (*Id*.) However, apart from documenting the general appearance of the neck, there is no indication of a detailed physical examination of the neck. (*Id*.) There is no indication in

this record that petitioner reported any of her neurologic symptoms affecting her neck, arm, and hand. New x-rays of petitioner's shoulder were obtained, which showed no acute fractures or dislocations; however, there is no indication that any of petitioner's prior imaging, test results, or medical records had been reviewed. (*Id.* at 4-5.) Petitioner's right shoulder pain was diagnosed as SIRVA and a subacromial steroid injection was administered. (*Id*. at 5.)

No further medical records have been filed. However, petitioner indicates in her written statement that, although the steroid injection initially provided relief, the pain eventually returned. (Ex. 40, pp. 4-5.)

## IV. Expert Reports

On petitioner's behalf, Dr. Bodor[6] initially opined that petitioner's "right shoulder and arm pain and weakness are related to her shoulder and not cervical radiculopathy, and the onset of her pain and weakness was within 48 hours of a flu vaccination." (Ex. 22, p. 4.) Dr. Bodor acknowledged that petitioner also experienced numbness, but opined that this is not specific to radiculopathy and has been reported as a feature of chronic shoulder pain even in the absence of nerve involvement. (*Id*. (citing Manoj Sivan et al., *Peripheral Paresthesia in Patients with Subacromial Impingement Syndrome*, 127 ARCHIVES ORTHOPAEDIC & TRAUMA SURGERY 609 (2007) (Ex. 27); Tse C. Lee & Marko Bodor, *Poster 77: Numbness in the Hand and Arm Related to Shoulder Dysfunction: A Case Series*, 89 ARCHIVES PHYSICAL MED. & REHAB. E45 (2008) (Ex. 28); Pedro Luis Escobar & Julian Ballesteros, *Teres Minor: Source of Symptoms Resembling Ulnar Neuropathy or C8 Radiculopathy*, 67 AM. J. PHYSICAL MED. & REHAB. 120 (1988) (Ex. 29; *see also* Ex. 39); DAVID G. SIMONS ET AL., TRAVELL & SIMONS' MYOFASCIAL PAIN AND DYSFUNCTION: THE TRIGGER POINT MANUAL, VOLUME 1. UPPER HALF OF BODY (2nd ed. 1999) (Ex. 30)).) He relied on the fact that petitioner's initial emergency department presentation included an inability to move her arm, but acknowledged that reduced active range of motion was first noted when she later

[6] Dr. Bodor received his medical degree from the University of Cincinnati, Medical School, in 1987, before going on to complete a surgery internship at the University of California, San Diego, in 1988. (Ex. 23, p. 1.) From there, he worked as an emergency physician at Physicians and Surgeons Hospital and Harborview Medical Center in San Diego, California, before going on to complete a physical medicine and rehabilitation residency at the University of Michigan in 1993. (*Id.*) Following his residency, Dr. Bodor accepted a position as an attending physician at Braintree Rehabilitation Hospital in Braintree, Massachusetts, followed by a position as an urgent care physician at the Emergency Physicians Medical Group in Ann Arbor, Michigan. (*Id.*) In 1995, Dr. Bodor started his own practice as an interventional physiatrist at Marko Bodor, M.D., Inc., Physical Medicine and Rehabilitation Sports Medicine, and Electrodiagnostic Medicine in Napa, California. (*Id.*) Dr. Bodor is board certified in physical medicine and rehabilitation, with a subspecialty in sports medicine and pain medicine, and he maintains a medical license in California. (*Id.*) He was "the first to describe two cases of vaccination-related shoulder dysfunction and the currently accepted mechanism of this complication in the journal Vaccine in 2007." (Ex. 22, p. 1 (citing Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007) (Ex. 24)).) He has authored 13 peer-reviewed publications, 3 book chapters and non-peer reviewed publications, and 6 peer-reviewed poster presentations and abstracts. (Ex. 23, pp. 8-9.) In his clinical capacity, Dr. Bodor has "treated over 40 patients with vaccination-related shoulder dysfunction in [his] practice since 2007." (Ex. 22, p. 1.)

pursued physical therapy. (*Id*. at 3.) Regarding the cervical radiculopathy diagnosis, Dr. Bodor indicated:

> [W]hen [petitioner] was not improving with physical therapy, Dr. Beiser considered alternative diagnoses, such as cervical radiculopathy. MRI was not definitive for cervical radiculopathy and neither was EMG. Physical examination never revealed a sensory deficit, loss of reflexes or focal strength deficit corresponding to the C5, C6 or C7 spinal levels that were possibly of concern based on non-specific MRI and EMG findings, the latter of which provide no data, just a conclusion, and was the most minimal EMG report I've ever seen in over 30 years of practice.

(*Id*.)

Ultimately, Dr. Bodor opined that "more likely than not, [petitioner] had a SIRVA injury to her right shoulder." (Ex. 22, p. 4.) He did not articulate any alternative opinion premised on causation-in-fact.

In response, Dr. Callaghan[7] opined on respondent's behalf that petitioner's symptoms are most likely attributable to cervical radiculopathy, which he described as compression of the nerve roots in the neck typically caused by arthritic changes or disc herniation, and which he explained has incidences of up to 179 per 100,000 person years. (Ex. A, pp. 4-5 (citing Brian C. Callaghan et al., *Distal Symmetric Polyneuropathy: A Review*, 314 JAMA 2172 (2015) (Ex. A, Tab 1)).) This condition typically includes pain that radiates to the arm and C6 radiculopathy in particular, as this petitioner had, often includes pain in the shoulder and arm. (*Id*. at 5.) Dr. Callaghan further stressed that petitioner saw an orthopedist and a neurologist, both of whom diagnosed cervical radiculopathy based on her clinical symptoms, examination, and cervical spinal MRI. (*Id*.) Furthermore, he urges that clinical history and MRI are sufficient to diagnose cervical radiculopathy. (*Id*. (citing John M. Caridi et al., *Cervical Radiculopathy: A Review*, 7 HSSJ 265 (2011) (Ex. A, Tab 2)).) More specifically,

---

[7] Dr. Callaghan received his medical degree from the University of Pennsylvania Medical Center in 2004, before going on to complete an internship in preliminary medicine and a neurology residency at the University of Pennsylvania Medical Center in 2005 and 2008, respectively, followed by a neuromuscular postdoctoral fellowship and an additional postdoctoral fellowship at the Center for Healthcare Research and Transformation Policy at the University of Michigan, Ann Arbor, in 2009 and 2016, respectively. (Ex. C, p. 1.) In the interim, Dr. Callaghan worked as a staff physician in the Department of Neurology at VA Ann Arbor Health System, as well as an assistant professor in the Department of Neurology at the University of Michigan Health System. (*Id.* at 1-2.) He was eventually elevated to a tenured professor and Eva L. Feldman Professor of Neurology. (*Id.* at 2.) He also maintains positions as a staff physician at the VA Ann Arbor Health System, as well as Co-Director of Neuromuscular Division and Associate Program Director for Research at the University of Michigan, Ann Arbor, and Director of the ALS Clinic at the VA Ann Arbor Health System. (*Id.*) Dr. Callaghan is board certified in psychiatry and neurology, electrodiagnostic medicine, and neuromuscular, and he maintains a medical license in Michigan. (*Id.* at 1.) In his clinical capacity, Dr. Callaghan has a primary interest in patients with neuropathy, such as cervical neuropathy, and he has treated over 200 patients with cervical neuropathy. (Ex. A, p. 1.) His research has mostly focused on neuropathy, including the appropriate diagnostic evaluation and treatment. (*Id.*) He has authored 166 peer-reviewed articles, 12 author replies, 5 book chapters, and several non-peer reviewed publications. (Ex. C, pp. 19-29.)

petitioner had symptoms of radiating pain, numbness and paresthesias into the arm and hand, and neck pain, all of which are more consistent with cervical radiculopathy, and her MRI demonstrated narrowing that would be expected to impinge on the right side at C6 and C7 nerve roots, while her EMG/NCS was consistent with a left C4-6 radiculopathy. (*Id*.)

In response to Dr. Bodor, Dr. Callaghan indicates:

> Dr. Bodor opines that the MRI and EMG/NCS were not definitive for radiculopathy. While MRI findings are common and do not always have a clinical correlate, the MRI does match with the clinical history and EMG/NCS. Further, EMG/NCS are specific but not sensitive for the detection of radiculopathy. ***Therefore, a positive EMG/NCS result means that a patient is very likely to have radiculopathy as in this case***. Dr. Bodor also opines that the EMG/NCS was the most minimal report he [has] encountered in 30 years. However, the NCS was quite extensive and the EMG evaluated 4 muscles. Doing more muscles would have increased the sensitivity, but since abnormalities were found, sensitivity is not an issue in this case.

(Ex. A, p. 5 (internal citation omitted) (citing Brian C. Callaghan et al., *Electrodiagnostic Tests in Polyneuropathy and Radiculopathy*, 315 JAMA 297 (2016) (Ex. A, Tab 3)).) Dr. Callaghan further opines that cervical radiculopathy rarely causes sensory deficits upon examination and only severe radiculopathies demonstrate weakness. (*Id*.) Reflexes are also frequently normal. (*Id*.) And, while numbness is not specific to radiculopathy, numbness radiating down the entire arm is most likely due to a cervical radiculopathy. (*Id*.) Moreover, numbness and paresthesias is not consistent with SIRVA. (*Id.*) Dr. Callaghan opines that the case series cited by Dr. Bodor to demonstrate paresthesias among patients with shoulder symptoms are inadequate to causally link the symptoms. (*Id*.) Ultimately, "[p]etitioner is documented as having radiating pain (to the right arm, hand, and fingers), and neck pain, which would not be expected in a musculoskeletal shoulder condition, but would be expected with cervical radiculopathy." (*Id*. at 6.) Thus, Dr. Callaghan opines that the diagnosis of cervical radiculopathy reached by both her treating orthopedist and neurologist explains her symptoms.[8] (*Id*.) Although a second orthopedist later diagnosed SIRVA, this occurred three years after the fact and involved no new diagnostic testing. (*Id*.)

In response to Dr. Callaghan, Dr. Natanzi[9] stressed that "[a] clear association between right shoulder and upper limb dysfunction and vaccination was identified

[8] Dr. Callaghan also explains that petitioner had a history of other unexplained complaints, especially affecting other parts of the body. He does not attempt to explain these other complaints, but he does note that they are not consistent with a musculoskeletal shoulder condition. (Ex. A, p. 6.)

[9] Dr. Natanzi received his medical degree in osteopathic medicine from Western University of Health Sciences in Pomona, California, in 2012, followed by an internship at Downey Regional Medical Center in Downey, California, in 2013, and a residency at University of California, Irvine, in 2016. (Ex. 35, pp. 1-2.) From there, Dr. Natanzi completed a fellowship in interventional regenerative sports and spine medicine

throughout nearly all of [petitioner's] medical records." (Ex. 34, p. 4.) Moreover, citing several medical records that correlated onset of shoulder pain to vaccination (Ex. 4, pp. 16, 21; Ex. 3, p. 8; Ex. 19, p. 9; Ex. 20, p. 1; Ex. 21, p. 4), Dr. Natanzi concludes that "I opine far beyond a reasonable degree of certainty that [petitioner's] symptoms began almost immediately after her vaccine and fell within the 48-hour rule for shoulder injury related to vaccine administration (SIRVA) criteria." (Ex. 34, p. 4.) Dr. Natanzi conceded that "[i]t is undeniable and evident in multiple records that [petitioner] had radiating pain into the right upper extremity after the vaccination that multiple providers thought was related to radiculopathy." (*Id*. at 5.) However, he opined:

> Perhaps most telling is the timing and development of symptoms. The development of these symptoms mere hours after [petitioner] received a vaccine on the ipsilateral shoulder cannot be overemphasized. An underlying cervical radiculopathy (a neck-mediated issue) developing acutely or flaring up after an injection into the deltoid (a superficial shoulder muscle) would be anatomically inexplainable and exceedingly improbable.

(*Id*.)

Acknowledging that a shoulder injection would not cause problems in the distal upper limb, Dr. Natanzi opines that petitioner's symptoms affecting her hand were caused by carpal tunnel syndrome unrelated to her shoulder condition. (Ex. 34, p. 4.) He indicates the carpal tunnel diagnosis is supported by petitioner's clinical presentation to Hanna Hofman, PA, on May 6, 2021, as well as by her EMG. (*Id*.) He suggests that the fact that petitioner's carpal tunnel syndrome and shoulder pain presented at about the same time is "mere coincidence." (*Id*.)

Although he acknowledges that cervical radiculopathy can cause severe pain in and throughout even a structurally sound shoulder, Dr. Natanzi opines that such symptoms are "different and distinguishable" from symptoms attributable to structural shoulder conditions, such as impingement or tendinopathy. (Ex. 34, p. 4.) In petitioner's case, Dr. Natanzi has "strong doubts" about the cervical radiculopathy diagnosis. (*Id*. at 5.) Specifically:

> On 5/6/21 (Exhibit 20 at 1), [petitioner's] neuro spine provider, Hanna Hoffman, PA, found no significant findings (minus weakened grip strength likely related to [carpal tunnel syndrome]) that could corroborate a suspicion

---

at Bodor Clinic in 2017. (*Id.* at 1.) He accepted a position as an attending physician at Pasadena Rehab Institute in Pasadena, California, in 2017, before going on to found Regenerative Sports and Spine Institute in Sherman Oaks, California. (*Id.*) He maintains positions as a staff physician at VA Long Beach Healthcare System in Long Beach, California, as well as medical director at Tova Surgical Center and Bayshore Surgical Center in Sherman Oaks, California. (*Id.*) He is board certified in pain management and physical medicine and rehabilitation, with fellowship training in interventional sports and spine medicine, and he maintains a medical license in California. (*Id.*; Ex. 34, p. 1.) In his clinical capacity, he "almost exclusively treat[s] musculoskeletal issues included but not limited to the shoulder joint," and he diagnoses and treats approximately 100 shoulder pathologies per month. (Ex. 34, p. 1.) He has authored 8 publications. (Ex. 35, p. 3.)

> of radiculopathy. Furthermore, [petitioner's] MRI shows absolutely no compression of any spinal nerve, which is almost always a finding in acute radiculopathy. I acknowledge the EMG findings, which were chronic, but in my opinion, they were coincidental and subclinical.

(*Id*.) Despite the fact that radiating symptoms would be more commonly associated with radiculopathy, Dr. Natanzi opines that, in petitioner's own presentation, they are related to her SIRVA injury. (*Id*.) He cites a study by Escobar & Ballesteros and Bayam et al. for the proposition that shoulder pathology can cause symptoms in the lower arm and hand. (*Id*. (citing Escobar & Ballesteros, *supra*, at Ex. 39; Levent Bayam et al., *Pain Mapping for Common Shoulder Disorders*, 40 AM. J. ORTHOPEDICS 353 (2011) (Ex. 37)).) He further asserts that Okur et al. and Atanasoff et al. also both documented hand and arm symptoms among patients with post-vaccination rotator cuff injuries. (*Id*. (citing Gokcan Okur et al., *Magnetic Resonance Imaging of Abnormal Shoulder Pain Following Influenza Vaccination*, 43 SKELETAL RADIOLOGY 1325 (2014) (Ex. 38); S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010) (Ex. 36)).)

Finally, Dr. Natanzi included a section in his report titled "Causation: SIRVA." (Ex. 34, pp. 5-6.) However, this discussion speaks to Dr. Natanzi's view that "[t]he course of events in this case is consistent with SIRVA." (*Id*. at 6.) Dr. Natanzi's report did not set forth any explicit opinion based on causation-in-fact nor identify a specific orthopedic diagnosis upon which to base such an analysis. Instead, Dr. Natanzi explained that petitioner had findings of restricted range of motion and impingement that he indicates cannot be explained by either radiculopathy or carpal tunnel syndrome. (*Id*. at 5-6.) He indicates that this "suggests a SIRVA injury." (*Id*. at 5.) Additionally, he opined that the acute post-vaccination onset and petitioner's response to a subacromial therapeutic injection further confirm a SIRVA. (*Id*. at 6.)

## V. Analysis

### a. Table SIRVA

As explained above, a petitioner shall be found to have suffered a SIRVA if four criteria have been met. Specifically: (1) there is no history of pain, inflammation, or dysfunction of the affected shoulder; (2) onset of shoulder pain occurs within 48 hours of vaccination; (3) the pain and reduced range of motion are limited to the affected shoulder; and (4) no other condition or abnormality is present that would explain the symptoms. 42 C.F.R. § 100.3(c)(10). Respondent's opposition does not break down his argument in accordance with the specific criteria, but instead argues flatly that petitioner's presentation is explained as a cervical radiculopathy, rather than a SIRVA. (ECF No. 69, pp. 6-9.) Based on my review, there is no meaningful dispute as to the first or second of the SIRVA criteria; however, in agreement with respondent's assessment, I find that petitioner has not satisfied either the third or fourth criterion.

The third SIRVA requirement – whether her "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered," 42 C.F.R. § 100.3(c)(10)(iii) – encompasses two considerations. First, this criterion requires an affirmative showing that the petitioner's presentation at some point included a reduction in range of motion. *Bolick v. Sec'y of Health & Human Servs*., No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). This aspect of the requirement is not at issue. Second, petitioner's presentation of pain and reduced range of motion must be reflective of a condition "localized to the shoulder in which the vaccine was administered." *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *12 (Fed. Cl. Spec. Mstr. May 2, 2023) (quoting National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 82 Fed. Reg. 6294-01, 6296 (proposed on Jan. 19, 2017) (to be codified at 42 C.F.R. Pt. 100)). Parsing this requirement can be challenging. While petitioner's condition must be localized to the shoulder, *e.g.*, *Durham*, 2023 WL 3196229, at *12, that does not mean that "a petitioner experiencing pain in the shoulder in addition to pain elsewhere is foreclosed from entitlement because the pain is not limited only to the shoulder." *Chu v. Sec'y of Health & Human Servs*., 180 Fed. Cl. 37, 74 (2026). Rather, "so long as petitioner has *one* condition localized to the shoulder, SIRVA is satisfied." *Id*.; *see also Werning v. Sec'y of Health & Human Servs*., No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder"). Thus, "prior decisions have indicated that some incidentally reported symptoms beyond the confines of the shoulder may not be dispositive of the nature of the petitioner's injury." *Durham*, 2023 WL 3196229, at *13.

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv). This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Human Servs*., No. 21-1312V, 2025 WL 868957, at *6 (Fed. Cl. Feb. 26, 2025). However, while the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Human Servs*., No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023). Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis. *Durham*, 2023 WL 3196229, at *14 (noting that the regulation cites "clinical evidence of" various conditions). "Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless 'would not explain' her symptoms." *Pulsipher v. Sec'y of Health & Human Servs*, No. 21-2133V, 2025 WL 1364203, at *10 (Fed. Cl. Spec. Mstr. Apr. 24, 2025), *mot. for rev. denied*, 179 Fed. Cl. 268 (2025).

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 300aa-11(c)(2). The

special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A)-(B). However, the special master is then required to weigh all of the evidence presented. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (quoting Vaccine Rule 8) (citing § 300aa-12(d)(3)), *aff'd sub nom. LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416-17.

The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule is not absolute. There is no presumption that medical records are accurate or complete as to all of a patient's physical conditions. *Kirby v. Sec'y of Health & Human Servs*., 997 F.3d 1378, 1383 (Fed. Cir. 2021). Afterall, "medical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs*., No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). "[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting the special master's decision), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992).

In this case, the evidence preponderates in favor of a finding that petitioner's symptoms are explained by her diagnosed cervical radiculopathy. Thus, petitioner's claim fails under the fourth SIRVA criterion. Additionally, petitioner consistently reported symptoms affecting her neck, arm, and hand, which are consistent with that cervical radiculopathy. Accordingly, petitioner's claim also fails under the third SIRVA criterion. The following points favor cervical radiculopathy as the better explanation for petitioner's condition:

- From the time of her very first treatment, petitioner consistently reported radiating pain beyond the confines of her shoulder, affecting her neck, arm, and hand. (Ex. 6, p. 411; Ex. 4, pp. 16, 21, 44; Ex. 3, p. 8.) Although

he came to a different overall conclusion, Dr. Natanzi conceded on petitioner's behalf that this presentation is "more commonly associated with radiculopathy." (Ex. 34, p. 5.)[10]

- Petitioner also had symptoms of numbness and tingling affecting the same region. (Ex. 3, p. 8; Ex. 9, p. 2; Ex. 4, pp. 16, 21, 44.) Dr. Callaghan opined on respondent's behalf that this is more consistent with cervical radiculopathy than a shoulder injury. (Ex. A, p. 5.) Although petitioner's experts counter that numbness is not only caused by radiculopathy (Ex. 22, p. 4 (Dr. Bodor)) and that it is possible for shoulder pathology to cause sensory symptoms in the lower arm (Ex. 34, p. 5 (Dr. Natanzi)), they have not rebutted Dr. Callaghan's opinion that cervical radiculopathy is the more likely explanation for such symptoms, especially given that this was the clinical judgment of the treating physicians.

- Petitioner had MRI evidence of bulging cervical spinal discs at C-5 through C-7 (Ex. 15, pp. 14-15), which both her treating orthopedist (*Id.* at 7) and Dr. Callagan (Ex. A, p. 5) correlated to her symptom distribution. Dr. Bodor likewise agreed that petitioner's physical exam finding correlated to her MRI findings. (Ex. 22, p. 4.) Although Dr. Natanzi cautioned that the MRI showed no compression of the spinal nerve (Ex. 34, p. 5 (discussing Ex. 20, p. 1)), this does not support a complete disregard of the MRI findings. Indeed, petitioner's treating neurosurgeon, whom Dr. Natanzi cites on this point, explicitly diagnosed a radiculopathy despite also noting that the lack of nerve compression did not warrant surgical intervention. (Ex. 20, pp. 1-2.)

- In contrast to the above, neither petitioner's treating orthopedist, nor petitioner's experts, have asserted that petitioner's right shoulder MRI included any findings that would explain her symptoms.

---

[10] Petitioner argues that she never reported pain radiating down specifically to her hand until May 3, 2021, seeming to suggest that this must be an error. (ECF No. 68, p. 34, n.12.) Petitioner raises this point because she asserts that it is only arm pain that extends beyond the elbow that indicates cervical radiculopathy, rather than shoulder pathology. (*Id.* at 34.) However, petitioner has not substantiated her intimation that the May 3, 2021 record is incorrect. Moreover, even if prior records did not specifically document pain radiating specifically to the hand, the prior medical records do repeatedly indicate that she has pain extending from her shoulder into her upper extremity. (Ex. 6, p. 411 (reporting pain that is "located in the right chest region, radiates into the [right upper extremity]"); Ex. 4, pp. 17-18 (noting on physical exam that petitioner had "some pain on pressure of mid R upper arm" and assessing "right shoulder/arm pain persistent"); Ex. 3, p. 8 (January 19, 2021 encounter, during which petitioner described "pain [that] starts over her shoulder and also extends along the border of her scapula"); Ex. 15, p. 11 (March 3, 2021 encounter, noting that petitioner "still complains of shoulder and neck pain with radicular type symptoms that extend to her right hand").) These records are better characterized as ambiguous with respect to how far the pain radiated, as opposed to evidencing that the pain stopped above the elbow. For example, some of the records associated petitioner's pain with a complete loss of function of her arm. (*E.g.*, Ex. 9, pp. 2-4.)

- The cervical radiculopathy diagnosis is also supported by confirmatory EMG findings. (Ex. 15, p. 16.) Dr. Bodor initially opined that the EMG result was "not definitive" (Ex. 22, p. 3); however, Dr. Callaghan explained that EMG is specific but not sensitive with respect to cervical radiculopathy (Ex. A, p. 5). Accordingly, a positive result means the radiculopathy is "very likely." (*Id*.) Subsequently, Dr. Natanzi did not rebut this explanation. Instead, he merely indicated that he acknowledged the finding, but felt it was "coincidental and subclinical." (Ex. 34, p. 5.) However, that suggestion is not persuasive in light of the record as a whole.

- Petitioner was diagnosed by a treating neurosurgeon as suffering a radiculopathy. (Ex. 20, pp. 1-2.) Moreover, the neurosurgeon specifically diagnosed a "radiculopathy affecting upper extremity." (ECF No. 68, p. 10 (quoting Ex. 20, pp. 1-2).)[11] Consistent with this, Dr. Natanzi conceded on petitioner's behalf that a cervical radiculopathy can cause shoulder pain. (Ex. 34, p. 4.)

- When petitioner first presented for orthopedic care, the orthopedist concluded that petitioner had "no mechanism [of] injury which would suggest a soft tissue injury of her right shoulder" and instead suspected her symptoms were neurologic. (Ex. 3, p. 9.) Then, as noted above, the orthopedist later correlated petitioner's symptoms to her cervical spinal abnormalities on MRI. (Ex. 15, p. 7.) Although petitioner sought a second opinion from a different orthopedist years later who did assess a SIRVA, the evaluation of that orthopedist does not appear to have been reliable for several reasons. First, petitioner provided an inaccurate history when she reported that her symptoms "are localized to the right shoulder." (Ex. 21, p. 4.) Second, the evaluation included no review of petitioner's prior medical records or, significantly, her MRIs and NCV/EMG. Third, the resulting diagnosis is vague insofar as the orthopedist documented SIRVA without identifying what underlying shoulder pathology would be at issue. (*Id*. at 5.)

[11] In her motion, petitioner quotes the neurosurgeon's record as stating "[t]here is no stenosis that requires surgical intervention at this time [nor] explains her current right upper extremity weakness, radicular symptoms." (ECF No. 68, p. 25 (alterations in original) (emphasis omitted) (quoting Ex. 20, p. 2).) Although the original record is unclear, petitioner's insertion of "nor" into this quotation is speculative. The original record states "[t]here is no stenosis that requires surgical intervention at this time were explains her current upper extremity weakness, radicular symptoms." (Ex. 20, p. 2.) But in any event, while there is no dispute in this case that the MRI did not show stenosis, petitioner nonetheless acknowledges that her neurosurgeon, at this same encounter, diagnosed a "radiculopathy affecting [the] upper extremity." (ECF No. 68, p. 10 (quoting Ex. 20, pp. 1-2).) Thus, even if crediting petitioner's interpretation of the record as stating that there is no stenosis that explains the symptoms, the presence of stenosis is not dispositive of whether the diagnosed radiculopathy explains petitioner's upper extremity symptoms.

- Considered holistically, Dr. Natanzi's and Dr. Bodor's view of petitioner's clinical history goes against the weight of the medical record evidence and is less credible. Dr. Natanzi's opinion in particular appears to be driven in significant part by disbelief that it would be reasonable to conclude that petitioner developed a cervical radiculopathy so soon after vaccination.[12] However, his competing explanation multiplies the coincidences necessary to explain all that happened. Specifically, instead of accepting that cervical radiculopathy is the most likely explanation for petitioner's overall presentation, he instead opines that she experienced a new shoulder injury with coincident carpal tunnel syndrome,[13] while also having cervical spinal pathology that remains subclinical despite coincidentally correlating to her symptom distribution and having EMG confirmation.

I have considered the arguments advanced in petitioner's motion, but find them unpersuasive in light of the above-discussed points. Petitioner stresses that a finding that her pain and reduced range of motion were not limited to her shoulder must be based on a preponderance of the evidence in light of the entire evidentiary record. (ECF No. 68, pp. 24-25 (citing *Overton v. Sec'y of Health & Human Servs*., No. 21-2286V, 2024 WL 1699205, at *6 (Fed. Cl. Spec. Mstr. Mar. 20, 2024)).) While this is true, petitioner does not adequately grapple with the details of her own history. Instead, she merely asserts in a blanket fashion that "shoulder pain and limited range of motion were consistently reported and the vast majority of her treatment focused on her right shoulder." (*Id.* at 25.) Simply, this is neither a credible nor complete accounting of the medical records. Nor is petitioner credible in arguing with respect to the fourth SIRVA criterion that her "medical records do not reveal any findings indicative of any other abnormality to explain her right shoulder symptoms." (*Id.* at 26.) While the relative value of various findings are disputed by the parties, this is an overstatement at best. I have considered all the arguments raised by petitioner regarding the details of her clinical presentation (*Id*. at 25-42), but do not find them persuasive. Petitioner argues that cervical and shoulder pathology can overlap and that symptoms of cervical radiculopathy are non-specific. (*Id.* at 37, 42.) However, petitioner's burden is ultimately to preponderantly demonstrate that cervical radiculopathy would not explain her symptoms. Even accounting for the fact that the onset of her symptoms was coincident to vaccination, she has not done so.

---

[12] On this point, while there is no question that onset of petitioner's condition occurred on the date of vaccination, I do not find her written statement credible in asserting that the onset of her pain began at the time of vaccination itself. (Ex. 40, p. 1.) Instead, I find the contemporaneous emergency department record more credible in indicating that the onset of her condition began just prior to her arrival at the emergency department. (Ex. 6, p. 411.)

[13] It should be noted, however, that petitioner was not diagnosed by her treating physician as suffering carpal tunnel syndrome. Although the NCV report ordered by the orthopedist indicated that the findings were "consistent with mild carpal tunnel syndrome" (Ex. 15, p. 16), her orthopedist subsequently assessed a cervical etiology for her symptoms after reviewing petitioner's MRI, NCV, and EMG results (*Id.* at 7).

**b. Causation-in-fact**

Even where a petitioner cannot demonstrate the specific requirements of a Table SIRVA, it is still possible to demonstrate the presence of a shoulder injury caused-in-fact by vaccination. *E.g.*, *Durham*, 2023 WL 3196229, at *14-15 (explaining that "[c]laims involving shoulder pathology in the presence of significant and potentially confounding neurologic signs and symptoms are better addressed on a causation-in-fact basis"); *Layne v. Sec'y of Health & Human Servs*., No. 18-57V, 2022 WL 3225437 (Fed. Cl. Spec. Mstr. July 12, 2022) (finding petitioner entitled to a shoulder injury caused-in-fact by vaccination after determining that evidence of cervical radiculopathy prevented the finding of a Table SIRVA); *Colbert v. Sec'y of Health & Human Servs*., No. 18-166V, 2022 WL 2232210 (Fed. Cl. Spec. Mstr. May 27, 2022) (same). In order to demonstrate a shoulder injury caused-in-fact by her vaccination, petitioner must meet the three-part *Althen* test without the benefit of any causal presumption. In this case, however, she has not done so.

Pursuant to *Althen* prong one, petitioner "references the fact that SIRVA is a recognized On-Table injury." (ECF No. 68, pp. 43-44.) In particular, petitioner argues that

> respondent has acknowledged the mechanism of injury for SIRVA, stating, "Shoulder Injury Related to Vaccine Administration (SIRVA) is an adverse event following vaccination thought to be related to the technique of intramuscular percutaneous injection (the procedure where access to a muscle is obtained by using a needle to puncture the skin) into an arm resulting in trauma from the needle and/or the unintentional injection of a vaccine into tissues and structures lying underneath the deltoid muscle of the shoulder."

(*Id*. at 44 (quoting National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 80 Fed. Reg. 45132-01, 45136 (proposed July 29, 2015) (to be codified at 42 C.F.R. Pt. 100)).) She also cites the fact that she has presented reports by Drs. Bodor and Natanzi, though she does not articulate how their opinions support her showing as to *Althen* prong one. (*Id*.) In response, respondent argues that "SIRVA is an injury defined by administrative rulemaking and therefore not a specific shoulder injury under which to pursue a claim of causation-in-fact." (ECF No. 69, p. 9.) Moreover, "[a]s petitioner does not identify a specific shoulder injury, she cannot establish a reliable medical theory linking the vaccination to her alleged injury." (*Id*.)

I agree with respondent. It is true that special masters have in at least some instances taken judicial notice of respondent's SIRVA rulemaking as constituting some evidence with respect to *Althen* prong one, *e.g.*, *L.J. v. Sec'y of Health & Human Servs*., No. 17-0059V, 2021 WL 6845593, at *14 (Fed. Cl. Spec. Mstr. Dec. 2, 2021) (stating that "the very decision to add a claim reflects Respondent's determination that valid science supports revising the Table"). Thus, I have repeatedly held that petitioners may rely on the available body of SIRVA literature to support a theory of causation. *E.g.*,

*Morris v. Sec'y of Health & Human Servs.*, No. 19-1570V, 2023 WL 5092691, at *6 (Fed. Cl. Spec. Mstr. July 11, 2023) (explaining that "[r]egardless of respondent's argument that the broader SIRVA concept is a creature of his own rulemaking, respondent cannot reasonably argue that these studies which he had already himself specifically endorsed are not persuasive as support for a medical theory of causation"); *Kelly v. Sec'y of Health & Human Servs.*, No. 17-1918V, 2022 WL 1144997, at *21-22 (Fed. Cl. Spec. Mstr. Mar. 24, 2022). However, consistent with respondent's view, I have also previously explained:

> [W]here a petitioner alleges both an on-Table SIRVA and off-Table shoulder injury, she must set forth a theory of causation to meet her burden for the off-Table claim. *Grant v. Sec'y of Health & Human Servs*., 956 F.2d 1144, 1147-48 (Fed. Cir. 1992) (explaining with respect to cause-in-fact claims that "[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner."). "The Act relaxes proof of causation for injuries satisfying the Table in § 300aa–14, but does not relax proof of causation in fact for non-Table injuries." *Id.* at 1148. The government's recognition of "SIRVA" as a vaccine-caused injury was limited by the accompanying QAI criteria and for the reasons discussed above, I have already concluded that petitioner has not met those criteria.

*Layne*, 2022 WL 3225437, at *18 (second alteration in original). To permit a petitioner to simply present the fact of the Table Injury of SIRVA as a theory of causation where that petitioner cannot meet the accompanying QAI criteria "would be to expand the causal presumption afforded by the Vaccine Injury Table." *Kelly*, 2022 WL 1144997, at *21.

Instead, it is well understood in the Program that petitioner "must specify [her] vaccine-related injury and shoulder the burden of proof on causation." *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010). In order to present an "injury" cognizable under the Vaccine Act, "[m]edical recognition of the injury claimed is critical" and petitioner must assert "more than just a symptom or manifestation of an unknown injury." *Id.* at 1349. "Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury – the Act specifically creates a claim for compensation for 'vaccine-related injury or death.'" *Stillwell v. Sec'y of Health & Human Servs.*, 118 Fed. Cl. 47, 56 (2014) (emphasis omitted) (quoting 42 U.S.C. § 300aa-11(c)). And, in any event, a petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim. *See* 42 U.S.C. § 300aa-13(a)(1)(A).

Here, as respondent urges, petitioner has not specified her alleged vaccine injury. Although petitioner purports to invoke the mechanism of "SIRVA" as a theory of causation, she did not allege any actual shoulder injury or pathology in either her initial or amended petition (ECF Nos. 1, 37) against which the applicability of that theory could

be assessed. Nor do her medical records or her experts' reports identify a specific shoulder injury as being at issue. Absent the type of causal presumption available under the Vaccine Injury Table, this offers no foothold for a cause-in-fact analysis.

Regarding *Althen* prong two, petitioner argues that she "was healthy without pre-existing pain or limitations in her right shoulder, the vaccine she received can cause SIRVA, she suffered SIRVA, the onset of symptoms occurred within an appropriate time period, and no likely alternative cause of her SIRVA has been identified."[14] (ECF No. 68, p. 45.) Further, noting that treating physician opinions are valued evidence with respect to demonstrating a logical sequence of cause and effect, she asserts that her symptoms "were repeatedly correlated to her preceding flu vaccine throughout her medical records." (*Id*. at 46.) These arguments are unpersuasive. Indeed, as respondent observes in his response, petitioner's arguments seek in effect to meet *Althen* prong two by simply recapitulating the SIRVA QAI criteria. (ECF No. 69, p. 10; *see also* ECF No. 68, p. 45 (petitioner explicitly arguing that she meets *Althen* prong two based on her purported satisfaction of the SIRVA criteria).)

In particular, petitioner's argument under *Althen* prong two is premised on the notion that she has ruled out cervical radiculopathy as any alternative explanation for her symptoms. However, for the reasons discussed above, I have concluded that the evidence preponderates in favor of a finding that petitioner's clinical presentation is explained by cervical radiculopathy. Thus, petitioner's entire argument is premised on factual assumptions that are not preponderantly supported. Additionally, based on my review of the medical records, what petitioner characterizes as correlation of her symptoms to her vaccination is merely petitioner's own subjective report to her physicians that she blamed her vaccination for her condition. While this is some evidence with respect to the underlying facts, *James-Cornelius v. Sec'y of Health & Human Servs*., 984 F.3d 1374, 1380 (Fed. Cir. 2021), a treating physician's mere reference to a temporal relationship between vaccination and symptoms is not equivalent to drawing a causal connection. *Moberly*, 592 F.3d at 1323-24; *Isaac v. Sec'y of Health and Human Servs*., No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012) (explaining that "[a] treating physician's recognition of a temporal relationship does not advance the analysis of causation"), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd per curiam*, 540 F. App'x 999 (Fed. Cir. 2013). Thus, I do not see where petitioner's medical records include any opinion by a treating physician

---

[14] This is a good example of a case in which use of the acronym "SIRVA" is apt to cause confusion in the cause-in-fact context. And, indeed, this type of confusion underscores respondent's concern often expressed throughout this Program's shoulder injury litigation that the concept of "SIRVA" should not be conflated with an injury caused-in-fact by vaccination. Petitioner is affirmatively arguing that she has demonstrated that a logical sequence of cause and effect implicates her vaccination as a cause of her condition primarily because "she suffered SIRVA." (ECF No. 68, p. 45.) But this begs the very question at issue. Unpacking the meaning of the acronym, what petitioner is arguing is that she has shown that her vaccine caused her injury because it was a shoulder injury "related to vaccine administration." By attempting to simply declare her injury a "SIRVA," even though she hasn't actually demonstrated the presence of a Table SIRVA, petitioner essentially seeks to preempt any actual consideration of cause and effect.

supportive of her claim apart from her later 2023 orthopedic re-evaluation, which is not reliable for the reasons discussed in the preceding section.

Finally, petitioner argues that onset of her shoulder symptoms began within 48 hours of vaccination, thereby satisfying her burden of proof under *Althen* prong three. (ECF No. 68, pp. 47-48.) Respondent does not raise any specific argument with respect to *Althen* prong three; however, he contends that Drs. Bodor and Natanzi based their causal assessments on temporal proximity alone and argues that that is legally insufficient to demonstrate causation-in-fact. (ECF No. 69, p. 10 (citing *Grant*, 956 F.2d at 1148).) I agree. The *Althen* Court specifically explained that "[a]lthough probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278; *see also Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355, 1364-65 (Fed. Cir. 2012) (holding the special master did not err in resolving the case pursuant to Prong Two when respondent conceded that petitioner met Prong Three).

## VI. Conclusion

Petitioner clearly suffered and she does have my sympathy. However, for all the reasons discussed above, there is not preponderant evidence of any compensable injury under the standards set by this Program. Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master